STONE *v.* HOLDEN.

1. WILLS — EXECUTION — STATUTES — SIGNATURE AT BOTTOM NOT
NECESSARY TO VALIDITY.

Under the statute in this State (3 Comp. Laws 1915, §
11821) relative to the execution of wills, where testator
himself filled in a blank form, writing his name at the

Authorities discussing the question as to whether writing name in body of will is a signature thereto, are collated in notes in 29 L. R. A. (N. S.) 63; 46 L. R. A. (N. S.) 552; L. R. A. 1917D, 632.

beginning and in the attestation clause, and there was
an intent on his part to adopt his name as so written
as his signature to the will, it is valid, although he did
not sign at the end.

2. SAME—ADOPTING SIGNATURE IN OTHER PART OF WILL—INTENT.
  Publication of the will as the last will and testament of
  testator, coupled with a request that the witnesses sign
  the attestation clause in which testator had himself writ-
  ten his own name, *held*, to establish a *prima facie* intent
  to adopt the name so written as his signature to the will.

3. SAME—EXECUTION—PRIMA FACIE CASE—DIRECTED VERDICT.
  Where the testimony for proponent establishing the execu-
  tion of the will was not met by contestant, a question
  of law was presented for the court requiring the direction
  of a verdict sustaining the will.

4. SAME—FRAUD NOT INFERRED.
  In the absence of any evidence justifying an inference
  that testator desired to deceive proponent, his fiancee, or
  that he never intended to execute his will, but drew
  it up for the purpose of deceiving her, there was no
  question of fraud to go to the jury merely because he
  failed to sign it at the bottom, since fraud, deceit, and
  dishonesty are never presumed but must be proven.

Error to Ingham; Carr (Leland W.), J.   Submitted
October 31, 1922.   (Docket No. 121.)   Decided De-
cember 29, 1922.

Ella Stone presented for probate the last will of
Jackson T. Norris, deceased.  The will was allowed
in the probate court, and Rizpah A. Holden appealed
to the circuit court.  Judgment for contestant.  Pro-
ponent brings error.  Reversed.

*Joseph H. Dunnebacke,* for appellant.

*Thomas, Shields & Silsbee,* for appellee.

Jackson T. Norris was at the time of his death
a resident of Lansing.  He had resided for some time
with the contestant, his daughter Rizpah A. Holden,

and her husband, at 600 Shiawassee street west. The proponent, Ella Stone, was a widow holding the position of assistant boys' matron at the School for the Blind. She had a sister who was a neighbor of the Holden family and who lived at 601 Shiawassee street west. She visited at her sister's and stayed there when not at the School for the Blind. Mr. Norris and Mrs. Stone became acquainted; their acquaintance progressed until they became engaged to be married. Mr. Norris then frequently called on her at the School for the Blind. Mr. Norris was not in good health and contemplated going to Biloxi, Mississippi, for the winter. On January 5, 1920, before leaving for Biloxi, Mr. Norris visited Mrs. Stone at the School for the Blind. He came shortly before 6 o'clock. Mrs. Stone as a part of her duties had to read to the boys, beginning at 6 o'clock after they had their supper. Mrs. Spinning, a matron, was called into Mrs. Stone's office about 6 o'clock, Mr. Norris informing her that he had some business to transact. Mr. Norris took from his pocket a blank form of will and proceeded to fill it out. Mrs. Clark, another employee of the school, was called in soon after Mr. Norris had commenced to write. When Mr. Norris had completed the instrument he read it over carefully to the two ladies and requested them to sign as witnesses. Mrs. Spinning's recollection of details was more definite than Mrs. Clark's; she testifies that Mr. Norris stated that it was his last will and testament when he asked them to sign as witnesses but the testimony of both of them establishes due publication of the will and a request for them to sign as subscribing witnesses. Mrs. Stone returned from her duties after the instrument was completed. Mr. Norris asked for an envelope which she gave him. He placed the instrument in the envelope, sealed it up and handed it to Mrs. Stone with the statement: "This is proof of my love for you."

She replied: "I need no proof for that. I know what you think of me." Mr. Norris returned from the south in the spring and thereafter was almost a daily visitor of proponent. He died, however, in June before their contemplated marriage was consummated.

After Mr. Norris' death, Mrs. Stone took the sealed envelope to contestant who opened it. She and her husband asked to be excused for a few minutes and upon their return informed Mrs. Stone that the instrument was not a valid will as it had not been signed. The instrument is as follows, the italicized words being all written by Mr. Norris except the signature and residence of the subscribing witnesses:

"I, *Jackson T. Norris,* . . . . . of *The City of Lansing* in the County of *Ingham* . . . State of *Mich.* . . . . . being of sound mind and memory, do make, publish and declare this to be my last will and testament, in manner following, viz:

"First, I will and direct that all my just debts and funeral expenses be paid in full.

"Second, I give, devise and bequeath to *Mrs. Ella Stone of the City of Lansing, Mich., one half of my estate. The other one half to my daughter Mrs. Rizpah A. Holden, 600 Shiawassee St., west, Lansing, Mich.*

. . . . ., I hereby appoint *Mrs. Rizpah Holden and Mrs. Ella Stone* City . . . . . of *Lansing* . . . . . . Executrix of this my Last Will and Testament . .

"Lastly, I hereby revoke all former wills by me at any time made.

"In Witness Whereof, I have hereunto set my hand and seal this *5th* . . day of *Jan.* . . . in the year of our Lord one thousand nine hundred and *1920* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (Seal)

"On this *5th* . . day of *Jan.* . . A. D. 1920 *Jackson T. Norris* . . . . of *Lansing* . . . . in the county of *Ingham* . . . State of *Mich.* signed the foregoing instrument in our presence, and declared it to be his Last Will and Testament, and as witness thereof, we do now, at *his* request, in *his*

221—Mich.—28.

presence, and in the presence of each other, hereunto subscribe our names.

"*Mrs. Celia Clark*  .  .  .  residing at *Lansing, Mich.*
"*Mrs. Jane E. Spinning*  .  residing at *Lansing, Mich.*"

The instrument was admitted to probate by the probate court of Ingham county. On appeal it was disallowed by the jury, the trial judge having submitted to the jury to determine whether Mr. Norris intended that his name written in the body of the instrument and attestation clause should stand as his signature to the instrument. Both sides had asked for a directed verdict.

FELLOWS, C. J. (*after stating the facts*). We shall consider the single question of whether the court should have directed a verdict sustaining the will. The question is concededly an open one in this jurisdiction. The case has been well briefed. An independent examination of the authorities in this country and in England discloses but few cases outside those cited by counsel which would assist the court in reaching a conclusion. Our statute relative to the execution of wills (3 Comp. Laws 1915, § 11821) follows the early English statute of Charles II (29 Car. II, chap. 3, § 5). Four years after the enactment of the English statute and in 1680 it received judicial construction in *Lemayne* v. *Stanley*, 3 Lev. 1 (83 Eng. Reprint 545). In that case one Stanley wrote his own will beginning, "In the name of God, Amen, I John Stanley, make this my last will and testament." He did not subscribe his name to the will. The question before the court was whether this was a sufficient "signing" under the English statute. The will was sustained,

"* * * for being written by himself, and his name in the will, it is a sufficient signing within the statute, which does not appoint where the will shall

be signed, in the top, bottom, or margin, and therefore a signing in any part is sufficient."

It is doubtless true that some courts in this country as well as the English courts have chafed under the holding of this early case; but it was followed in England until parliament changed the statute by 1 Vic. chap. 26, § 9, which required that the will "shall be signed at the foot or end thereof." This statute proved unsatisfactory and was further amended by 15 and 16 Victoria, chap. 24, § 1, which makes wills valid,

"* * * if the signature shall be so placed at or after, or following, or under, or beside, or opposite to the end of the will, that it shall be apparent on the face of the will that the testator intended to give effect by such his signature to the writing signed as his will" (followed by other provisions quite materially affecting the act passed in the first year of the reign of Victoria).

The early English statute of Charles II enacted in 1676 as a part of the statute of frauds was followed not only in this State but in a large number of the States of the Union. Some of the States have changed their original statutes by amendment. We are persuaded that the tendency of the courts of those States which have left their statutes unimpaired by amendment is to follow the early English case of *Lemayne* v. *Stanley, supra.* That case placed a construction on the statute long before it was adopted in this country and we took the statute impressed with that construction. We shall not discuss all the cases cited. Some of them, however, will be discussed. All of them have been examined.

*Meads* v. *Earle,* 205 Mass. 553 (91 N. E. 916, 29 L. R. A. [N. S.] 63), is quite similar to the instant case. The will there involved was that of Sarah J. Armstrong. She was about to sail for Italy and procured a blank which she filled out, writing her own name

at the beginning and in the attestation clause. She did not sign on the line provided in the blank for her signature. She requested the witnesses to sign as witnesses and there was evidence of publication. It was held that there was a sufficient signing, citing *Lemayne* v. *Stanley, supra.*

The Vermont court in *Adams* v. *Field,* 21 Vt. 256, had a very similar question before it. The will in that case commenced:

"I, Samuel Adams of Westhaven, etc., do hereby make this last will and testament."

It was in the handwriting of the testator but was not signed at the end. There was an attestation clause purporting to be signed by the requisite number of witnesses. The trial judge had submitted the case to the jury who had sustained the will. It was held that the will was properly signed and it was there said:

"If the will, as the jury must have found in this case, was attested by three witnesses in the presence of the testator and in the presence of one another, and published by the testator in their presence, as his last will and testament, it was to all intents and purposes an adoption of such a signature, as was then affixed to the will; and if the will then had such a signature, as could be held sufficient under the statute, nothing farther need be done. The will then becomes complete, and possesses all the finality which can be required. It is the same thing, in effect, as if the signature had been originally made *animo signandi.*"

Attention may be called to the fact that the Vermont case was sent to the jury but the statement of facts shows that the testimony of the subscribing witnesses was in direct conflict, two of them denying their signatures and the execution of the will as testified by the other one. Manifestly these disputed facts took the case to the jury.

In *Armstrong's Ex'r* v. *Armstrong's Heirs,* 29 Ala.

538, the will had been written by another at Armstrong's direction and although published by him was not signed at the end. The State had followed the statute of Charles II. In considering the second requisite of the statute, *i. e.*, that it be signed by the testator or by some person in his presence and by his direction, it was said:

"Section 1611 of the Code, so far as it relates to the second requisite, is a substantial transcript of that part of the 5th section of 29th Car. II, chap. 3, which related to the signing of the will; and therefore, the construction which had been put upon that part of the British statute, and settled as its true construction, by the British decisions before the adoption of our statute, ought to be regarded as the construction which our legislature intended to be put upon that part of our statute now under consideration. We shall adopt and follow that construction."

And again the early case of *Lemayne* v. *Stanley, supra,* was relied upon. To the same effect see *Ex parte Cardozo,* 135 Md. 407 (109 Atl. 93); *Peace* v. *Edwards,* 170 N. C. 64 (86 S. E. 807, Ann. Cas. 1918A, 778); *Sarah Miles' Will,* 4 Dana (Ky.), 1; *In re Phelan's Estate,* 82 N. J. Eq. 316 (87 Atl. 625); *Armstrong* v. *Walton,* 105 Miss. 337 (62 South. 173, 46 L. R. A. [N. S.] 552, Ann. Cas. 1916E, 137).

The language used in *Re Booth,* 127 N. Y. 109 (27 N. E. 826, 12 L. R. A. 452, 24 Am. St. Rep. 429), cited by contestant, and the holding of the court in that case militate against the doctrine announced in the cases considered and cited more strongly than any case we have examined unless it be the language and holding in *Sears* v. *Sears,* 77 Ohio St. 104 (82 N. E. 1067, 17 L. R. A. [N. S.] 353, 11 Ann. Cas. 1008). But an examination of the statutes of these States shows a legislative policy to require more than the statute of Charles II required for the due execution of a will. The statutes of both States require that the

signature shall be at the end (Rev. Stat. of N. Y., pt. 2, chap. 6, tit. 1, art. 3, § 40; 3 General Code of Ohio, § 10505). That the New York court had gone fully as far as it felt it should in the way of strict construction is evidenced by language used by that court in *Re Field*, 204 N. Y. 448 (97 N. E. 881, 39 L. R. A. [N. S.] 1060; Ann. Cas. 1913C, 842), where it was said:

"The evil of fraudulent changes in wills is rare, while the evil of defeating wills altogether in the manner suggested is common. Hence, we think we have gone far enough in the direction of rigid construction and that the doctrine of certain authorities should not be extended, lest in the effort to prevent wrong we do more harm than good."

The legislative policy of California is the same as that of New York and Ohio and requires that wills other than holographic wills be subscribed at the end (Kerr's Civil Code 1920, § 1276). In *Re Manchester's Estate*, 174 Cal. 417 (163 Pac. 358, L. R. A. 1917D, 629, Ann. Cas. 1918B, 227), cited by contestants, the will was a holographic will (as to holographic will, see section 1277 of the California Civil Code). Upon the whole the case sustains contestant's claim. An examination of the Virginia cases discloses that although that State had followed the statute of Charles II, there was a disinclination on the part of the court of appeals of that State to follow the construction placed upon it in the case of *Lemayne* v. *Stanley*, *supra*. The case of *Waller* v. *Waller*, 1 Grat. (Va.) 454 (42 Am. Dec. 564), was decided in 1845. It involved an unattested holographic will. The opinion of Justice Allen which was not concurred in by the full bench is an exhaustive one. In 1849 the legislature amended the statute (2 Code of Va. 1919, § 5229), and in *Ramsey* v. *Ramsey's Ex'r*, 13 Grat. (Va.) 664 (70 Am. Dec. 438), a case of another unattested holographic will, the court fully reviewed the

*Waller Case* and held that the amendment had enacted the rule announced by Justice Allen in that case and had furnished a rule for the admission of wills in the future. In *Roy* v. *Roy's Ex'r,* 16 Grat. (Va.) 418 (84 Am. Dec. 696), another unattested holographic will was before the court. In *Murguiondo* v. *Nowlan,* 115 Va. 160 (78 S. E. 600), the fact that the *Waller Case* involved an unattested will was commented upon and speaking of that case it was said:

"It would seem, therefore, from the opinion of Judge Allen, that the main fact of the connection of the testator with the instrument may be established, not only by the signature of the testator in the presence of subscribing witnesses, but by the mere acknowledgment in their presence of his signature; that such proof has been deemed sufficient in all the later cases; and that the finality of an attested will is established by attestation and publication; for, to repeat a pregnant sentence in the opinion of Judge Allen, 'no man publishes an instrument as his last will and testament, and calls on witnesses to attest the fact, until he has completed the act. The attestation must be annexed or subscribed to a complete instrument, and to which, when so subscribed, no additions can be made.' "

In *Dinning* v. *Dinning,* 102 Va. 467 (46 S. E. 473), the will was holographic, concluding with these words:

"I, William Dinning, say this is my last will and testament."

This was held to be a good signing.

*Catlett* v. *Catlett,* 55 Mo. 330, tends to sustain contestant's counsel but *Kolowski* v. *Fausz,* 103 Ill. App. 528, on the whole does not. 40 Cyc. p. 1104, cited by both parties, has this to say:

"Where the statute relating to signing requires no more than the statute of frauds—merely that the will shall be in writing and be signed, it is immaterial where the testator's signature was placed, if it was placed there with the intention of authenticating the instrument. It is essential, however, that the signa-

ture, whatever its local position, must have been made with the design of authenticating the instrument and that he should have contemplated no further signing."

We conclude, therefore, that under our statute the testator need not sign the will at the end in order to constitute a valid signing.

In the briefs and upon the argument proponent's counsel stressed the word "adopt" found in the authorities in connection with a signature not at the end of the will, while contestant's counsel stressed the word "intent" used in the same connection. We do not think we would go far awry if both words were used. Under the weight of authority a will is properly signed if there is an intent on the part of the testator to adopt his name as written by him at the beginning of the will or in the attestation clause as his signature to the will. This fairly states the holdings of the courts of last resort in those States which have followed the statutes of Charles II without amendment. It logically follows that publication of the will as the last will and testament of the testator, coupled with a request that the witnesses sign the attestation clause in which the testator has himself written his own name, establishes at least *prima facie* the intent to adopt such name so written as his signature to the will. Recurring again to the facts: the undisputed testimony established publication of the will, it established a request to the witnesses to sign the attestation clause which certified that the testator, Mr. Norris, had "signed the foregoing instrument in our presence, and declared it to be his last will and testament." This established the due execution of this will and, unless the case so made by the proponent is met, required the direction of a verdict sustaining the will.

Has the case made by the proponent been met by anything appearing in this record requiring or authorizing its submission to the jury? We think not.

What we have already said disposes of the fact that Mr. Norris did not write his name again on the dotted line. This, as we have seen, presented a question of law for the court. But contestant's counsel urge that the will was signed in the presence of friends of Mrs. Stone and was left with her, and counsel insist that they had the right to argue to the jury and to this court that Mr. Norris was but deceiving the woman he was engaged to marry. Doubtless such argument was made to the jury and accepted by them, as they disallowed the will. But there is not a scintilla of evidence to sustain it. It doubtless appealed to the jury, sometimes prone to disallow wills, but without evidential support it cannot appeal to our legal judgment. It is passing strange that children are willing to blacken the memory of their parents when their property interests are involved. It is their legal right so to do if they produce evidence of their parents' short-comings. But the record in the instant case justifies no such attack. So far as this record discloses Mr. Norris was an honorable and honest man. He was engaged to Mrs. Stone, who, as disclosed by this record, was a refined, educated woman, earning her living in helping to care for the unfortunate wards of the State. Mr. Norris was not in good health. He was going away. He had an affection for the woman he was to marry. He was doubtless fond of his daughter; he lived with her. He divided his belongings between the two women he cared for; his intended wife and his daughter. Why he should deceive or attempt to deceive Mrs. Stone is not pointed out by counsel, and we fail to discover any reason upon this record. Fraud, deceit, dishonesty are never presumed; they must be proven. There is a total want of evidence or any circumstances justifying a legitimate inference that Mr. Norris desired to deceive Mrs. Stone or what profit it would be to him if he did de-

ceive her.  The court should have directed a verdict sustaining the will.

The case will be reversed with a new trial and with costs of this court to appellant.

WIEST, MCDONALD, CLARK, BIRD, SHARPE, and STEERE, JJ., concurred.  MOORE, J., did not sit.