*In re* BEM ESTATE
BEM v BEM

Docket No. 221549. Submitted August 7, 2001, at Detroit. Decided September 14, 2001, at 9:05 A.M.

John A. Bem petitioned the Wayne County Probate Court for the admission into probate of a holographic will written by his deceased father, Joseph R. Bem. The two-page will starts with the following words: "Aug. 15, 1991. Being of good health and right mind I write this just in case something should happen to me on the projected trip to Louisville, Kentucky . . . August 16 to . . . August 17, 1991 . . . ." The will, on the first page and the upper third of the second page, provides for the appointment of John Bem as personal representative, forgives a loan to Mary Lou Ziarko, a daughter of the testator, and lists specific gifts of money and personal property to members of the testator's family. In the middle of the second page and at the end of all the text that was written on August 15, 1991, the testator signed his name and wrote August 15, 1991, under his signature. The testator subsequently added nine additional handwritten lines of text below where he had written August 15, 1991. The first such line states: "The trip to Louisville, KY was OK . . . (J R Bem.) Aug 17, 1991." The second line states: "Next trip is to . . . Buffalo N.Y. Oct. 19, 1991." The third line states: "All conditions remain the same as written Aug 18, 1991 * J R Bem." The fourth and fifth lines state: "Extra=Three Sisters = Bernice Burchart + Rose Brent + Genevieve Drew shall receive the sum of 1000.00 each. * J R Bem 10-17-91." The sixth line states: "Buffalo Trip Completed OK. All Conditions Remain the Same. Nov. 14, 1991 JRB." The seventh line states: To HAWAII Dec 5, 1991 All conditions Remain the Same. J R Bem Dec 4 1991." The eighth line states: "To Las Vegas OK 1992 JRB." The ninth line states: "To Tennessee Oct 23-4-5-6-1992." Rosemarie L. Bem, a daughter of the testator, contested the validity of the will, claiming that the portion of the holographic will dated August 15, 1991, did not comply with MCL 700.123 because the testator had not signed and dated the document at the "end of the will" as required in the statute. She further claimed that the codicil adding the devises to the testator's sisters required the testator to republish the will in full and that the testator had failed to do so because the signature on the fifth addi-

tional line should be read as if appearing elsewhere in the will. Ms. Bem also claimed that the will was conditioned on the testator's death during the enumerated trips and that, because the testator had not died on any of the trips, the condition precedent had not occurred to make the will effective. The probate court, David J. Szymanski, J., rejected Ms. Bem's claims and admitted the holographic will into probate. Ms. Bem appealed.

The Court of Appeals *held*:

1. At the time of the testator's death on November 3, 1998, MCL 700.123 provided that a holographic will was valid if it was dated, the testator's signature appeared at the end of the will, and the material provisions of the will were in the handwriting of the testator. For purposes of the statute, "end of the will" means the place that follows the material text of the will disposing of the estate, wherever that place may be on the page. The Legislature intended to permit a testator to sign a will in a place following its material provisions, even if the signature does not appear at the bottom of the page on which the will was written and even if other text or markings appear on the same page. The holographic will in this case satisfied the signature requirement in MCL 700.123. Joseph Bem's signature for the August 15, 1991, will clearly appears at the conclusion of that will. The additional lines of text below Joseph Bem's signature on August 15, 1991, do not affect the validity of the August 15, 1991, will. The fourth and fifth lines operate as a codicil by which the testator's sisters are to each receive $1,000. This codicil was written, dated, and signed at the end by the testator, thus complying with the requirement that it be executed in the same manner as the will. Contrary to Ms. Bem's contention, the asterisk or star-shaped mark before the testator's signature for the codicil does not serve as an internal cross-reference device to disassociate the signature from the codicil. No definitive meaning can be given to a mark that may have been intended to draw attention to the testator's signature, to insert the date below the testator's signature into the proper place on the fifth line, or merely as a doodle. The first additional line of text sets forth a statement of historical fact similar to a diary entry and was not an attempt to republish the August 15, 1991, will or to provide for a codicil to that will. The second and third lines operate to republish the August 15, 1991, will, even though republication is not required in the absence of a revocation of that will. In any event, the second and third lines comply with the formalities in MCL 700.123. The sixth line combines elements of the first and third additional lines, reporting a matter of historical fact and continuing the conditions of the will. Again, although republication of the will is not required, the republication embodied in the sixth line complies with the formalities of

MCL 700.123. The seventh line is essentially the same as the third and fourth lines. As with the third and fourth lines, the seventh line has no effect on the August 15, 1991, will as amended by the codicil. The eighth and ninth lines are extraneous statements that do not refer to the will or a testamentary disposition in any way whatsoever, and the fact that they were not dated is of no consequence with respect to the validity of the will and the codicil.

2. Although there is no magic formula for creating a conditional will or a conditional devise within a will, a testator must use clear and unambiguous language to create the condition. In this case, nothing on either of the pages of the will drafted by the testator suggests that the testator intended to say that if he died on any of the enumerated trips, then and only then did he want his estate distributed according to the will. The reference that most resembles a condition precedent in this case—"Being of good health and right mind I write this just in case something should happen to me on the projected trip to Louisville, Kentucky"—can reasonably be interpreted to mean that the testator decided to draft a will because he thought there was a possibility that he might die during the trip, not that he wanted the will to be valid only if he died on the trip.

Affirmed.

1. WILLS — HOLOGRAPHIC WILLS — SIGNATURE AT THE END.

"End of the will," as used in the provision of the Revised Probate Code that required that a holographic will be signed by the testator at the end of the will, means the place that follows the material text of the will disposing of the estate, wherever that place may be on the page on which the will was written (MCL 700.123).

2. WILLS — CONDITIONAL WILLS.

A testator must use clear and unambiguous language to create a conditional will; when presented with ambiguous language, Michigan courts rely on the rule of will construction that favors adopting any reasonable construction of a will in order to avoid intestacy if possible.

*Pytell & Varchetti, P.C.* (by *Paul E. Varchetti*) and *Fitzgerald & Dakmak, P.C.* (by *Gerald F. Fitzgerald, Jr.*), for Rosemarie L. Bem.

*Finkel, Whitefield, Selik, Raymond, Ferrara & Feldman, P.C.* (by *David E. Sims* and *Aaron H. Sherbin*), for John A. Bem.

Before: BANDSTRA, C.J., and WHITBECK and OWENS, JJ.

PER CURIAM. Will contestant Rosemarie Bem appeals as of right the probate court's order admitting her father's holographic will. We affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

On August 15, 1991, Joseph R. Bem, the testator, drafted a two-page will in his own handwriting.[1] Mr. Bem began the will by noting the date and stating, "Being of good health and right mind I write this just in case something should happen to me on the projected trip to Louisville, Kentucky for the Amvets National Convention (5:45 AM Aug. 16 to 10:PM [sic] Aug. 17, 1991)." Mr. Bem appointed his son, will proponent John A. Bem, as his personal representative, charging him to take care of all his "personal, financial and spiritual arrangements." Mr. Bem then proceeded to forgive a loan to his daughter, Mary Lou Ziarko, and list by number specific gifts of money and other personal property to family members, including a $1,000 devise to his other daughter, Rosemarie Bem. The will continued to enumerate these gifts on the top of the second page and ended approximately one-third of the way down the second page, stating, "Fourteenth = There are many more requests but for now this is all I desire to have done." In the middle of the page, at the end of all the text he had written on August 15, Mr. Bem signed his name. He wrote the date August 15, 1991, for a second time in the will, just under his signature.

---

[1] We have attached the best available copy of Mr. Bem's will as an appendix to this opinion.

Though this was the natural end to the holographic will, Mr. Bem subsequently added nine additional lines of text by hand just under this signature and date block. The first line states, "The trip to Louisville, KY was OK. (JRBem.) Aug 17, 1991[.]" A dash and what appears to be a notation of "10-30-" immediately follows this date, with "*PM*" written directly beneath the "30" because of the lack of space at the end of the line. The second line notes, "Next trip is to Post 45 Buffalo N.Y. *Oct 19, 1991*[,]" and appears grouped with the third line, which reads, "All Conditions remain the same as written" and ends "Aug 18, 1991 * JRBem." The fourth and fifth lines add new devises, stating, "Extra = Three Sisters = Bernice Burchart + Rose Brent + Genevieve Drew shall receive the sum of 1000 $^{00}$ each. * J R Bem[.]" The fourth line breaks and the fifth line starts between "Genevieve" and "Drew." The date "10-17-91" appears squeezed under Mr. Bem's signature at the end of the fifth line because there is no additional room to write after the signature. The remaining four lines refer to other trips Mr. Bem took or planned to take:

> Buffalo Trip Completed OK. All Conditions Remain the Same. Nov. 14. 1991
>    JRB.
> To HAWAII Dec 5, 1991 All conditions Remain the Same. JRBem Dec 4 1991
> To Las Vegas OK 1992 JRB
> To Tennessee Oct 23-4-5-6-1992

After Mr. Bem's death, John Bem commenced probate proceedings. However, Rosemarie Bem, who would presumably take less under the will than if the probate court were to decide that the will was invalid and that her father had died intestate, decided to con-

test the will's validity. She claimed that the portion of the holographic will dated August 15, 1991, did not comply with MCL 700.123 because Mr. Bem had not signed and dated the document at the "end of the will" as required in the statute. Rosemarie Bem contended that the codicil adding the devises to Mr. Bem's sisters required Mr. Bem to republish the will in full. However, he had failed to do so because the signature on the fifth additional line should be read as if appearing elsewhere in the will and, therefore, he had omitted his signature following this codicil. She also argued that the will was conditioned on her father's death during the enumerated trips and, because he had not died on any of the trips, the condition precedent had not occurred to make the will effective.

The probate court, however, rejected each of these arguments. The probate court ruled that Mr. Bem had signed the August 15 will at the natural end, and that his codicil was valid because it was signed and dated. Further, the reference to Mr. Bem's trip to Louisville in the first line of the will did not make the document conditional or contingent; rather, according to the court, it was a statement of the motivating force behind Mr. Bem's decision to write a will. On appeal, Rosemarie Bem reiterates her original arguments.

## II. STANDARD OF REVIEW

When it is unnecessary to consider extrinsic evidence to interpret a will, as is almost always the case,[2] a probate court's findings are not factual in

---

[2] See *In re McPeak Estate*, 210 Mich App 410, 412; 534 NW2d 140 (1995) (latent ambiguity in will may be proved with extrinsic evidence, but usu-

nature. Rather, as when interpreting a contract,[3] the probate court, in restricting its analysis to the language of the will, engages in an inquiry to determine the legal effect of the words used. The legal effect of the language in the will ultimately determines how the personal representative must distribute the assets of the testator's estate.[4] Thus, though we would accord the probate court in this case due deference and apply a clear error standard of review to any issues requiring factfinding,[5] we review de novo the language used in Mr. Bem's will because its meaning presents a question of law.[6] This de novo standard of review is also appropriate in this case because the probate court decided whether the will is valid in the context of Rosemarie Bem's motion for summary disposition[7] and because, for the first issue in this appeal, we must interpret and apply the holographic will statute in the Revised Probate Code.[8]

## III. CONSTRUCTION

The issues Rosemarie Bem raises in this appeal require us to engage in two types of construction: statutory construction and construction of the will. Because we use the principles of construction

---

ally "the court is to glean the testator's intent from the four corners of the testamentary instrument.").

[3] See *Bandit Industries, Inc v Hobbs Int'l, Inc*, 463 Mich 504, 511; 620 NW2d 531 (2001).

[4] See, e.g., *In re Norwood Estate*, 178 Mich App 345, 349; 443 NW2d 798 (1989) (interpreting only text of will to determine how to dispose of insurance assets).

[5] See *In re Coe Trusts*, 233 Mich App 525, 531; 593 NW2d 190 (1999).

[6] See *People v Falk*, 244 Mich App 718, 721; 625 NW2d 476 (2001).

[7] See *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998).

[8] See *In re Coe Trusts, supra* at 531.

throughout this opinion, we think it provident to outline them at the outset.

This Court, in *Guardian Industries Corp v Dep't of Treasury*,[9] expressed the fundamental rules of statutory construction well when it wrote:

> The primary goal of statutory interpretation is to give effect to the intent of the Legislature. This determination is accomplished by reviewing the plain language of the statute itself. If the statutory language is unambiguous, it is presumed that the Legislature intended the clearly expressed meaning, and judicial construction is neither required nor permitted. If the statutory language is ambiguous, only then may we look outside the statute to ascertain the Legislature's intent.

We must also take our interpretation of the holographic will statute and apply it to Mr. Bem's will. As in the context of statutory interpretation, the core purpose of interpreting wills is to give effect to the drafter's intent, limited only by applicable law.[10] To carry out this intent, we must read the will "as a whole"[11] and "harmonize all the provisions, if possible, to that intent."[12] "Given the complexity of some wills, it would be counterproductive for this Court to hyperanalyze and overscrutinize" clear, plain language the testator used.[13]

---

[9] *Guardian Industries Corp v Dep't of Treasury*, 243 Mich App 244, 248-249; 621 NW2d 450 (2000) (citations omitted).

[10] *In re Coe Trusts, supra* at 533-534.

[11] *Townsend v Gordon*, 308 Mich 438, 444; 14 NW2d 57 (1944).

[12] *Stebbins v Stebbins*, 86 Mich 474, 478; 49 NW 294 (1891).

[13] *In re Coe Trusts, supra* at 535.

IV. HOLOGRAPHIC WILL FORMALITIES

A. SIGNATURE REQUIREMENT

At the time Mr. Bem died on November 3, 1998, the Revised Probate Code was in effect, not the new Estates and Protected Individuals Code.[14] In MCL 700.122, the Revised Probate Code prescribed certain formalities, including the need for witnesses, for executing most wills. However, the Revised Probate Code also established a less formal type of will in MCL 700.123:

> A will which does not comply with section 122 is valid as a holographic will, whether or not witnessed, if it is dated, if the signature appears *at the end of the will* and the material provisions are in the handwriting of the testator.[15]

Rosemarie Bem contends that Mr. Bem's will did not comply with this statute because he signed his will in the middle, having added unsigned devises to his sisters and additional lines below his signature following the dispositive language in the August 15 will. Thus, she claims, her father died intestate because the will is invalid.[16]

Michigan case law does not interpret this holographic will statute. Nevertheless, a case published long ago gives us insight into how we must view the requirements set forth in MCL 700.123. The Michigan Supreme Court, in *Stone v Holden*,[17] inter-

---

[14] See MCL 700.8101(1).

[15] Emphasis added.

[16] Rosemarie Bem also makes a brief argument concerning the date requirement under the holographic will statute. A full analysis of the date requirement in MCL 700.123 is not necessary, and we dispose of this argument briefly at the end of the analysis in this section.

[17] *Stone v Holden*, 221 Mich 430, 434; 191 NW 238 (1922), interpreting 1915 CL 11821.

preted a formal will statute that required the testator to sign the will, but gave no specific direction concerning where or how that signature had to appear. The Court reversed the jury verdict in favor of the will contestant, who had challenged the will's validity on the basis that the testator's signature appeared only within the attestation clause.[18] In reversing, the Court rejected the custom of other jurisdictions requiring this signature to appear at the end of the will, noting that it was a matter of "legislative policy" that required this formality for wills in those other states.[19] Thus, *Stone* stands for the proposition that when the Legislature imposes conditions on a signature requirement, those conditions must be enforced as written. However, even in giving this deference to the Legislature, *Stone* makes clear that courts need not impose on wills any conditions or formalities not clearly reflected in the statute. Accordingly, it is plain to us from this holographic will statute that the Legislature intended that testators follow this formality of signing a holographic will at the "end." If this requirement is not met, the will must be declared invalid. That the Legislature did not specify where a signature must appear in a will conforming to the formalities prescribed in MCL 700.122, but decided to impose this requirement in MCL 700.123, only supports our conclusion that a signature at the "end" of a holographic will is mandatory.

What, however, is the "end" of a will? The parties posit opposing interpretations of this word. Rosemarie Bem's underlying premise is that the "end" of a will is the bottom of the page on which it was writ-

---

[18] *Id.* at 433-434, 442.
[19] *Id.* at 437-438.

ten. The probate court, however, agreed with John Bem that the "end" of the will is the place that follows the material text of the will disposing of the estate, wherever that place may be on the page. Given the plain meaning of the language used in MCL we believe that the probate court and John Bem are correct. We assume that the Legislature intended to give the word "end" its normal meaning rather than a technical meaning not apparent from this context.[20] The word "end" does not imply a set position. The "end" simply is "a point that indicates the full extent of something," such as its "limits" or "bounds," or simply a point of "termination" or "conclusion."[21] Had the Legislature wanted the signature on a holographic will to appear in a fixed position, it could have used[22] a word like "bottom," a superlative meaning "the lowest or deepest part of anything."[23]

This definition of the "end" of a will is consistent not only with Michigan's less formal approach to interpreting wills[24] but also with the underlying pur-

---

[20] See MCL 8.3a; see also *People v Nimeth*, 236 Mich App 616, 620; 601 NW2d 393 (1999), quoting *People v Hack*, 219 Mich App 299, 305; 556 NW2d 187 (1996) (" 'Unless defined in the statute, every word or phrase therein should be accorded its plain and ordinary meaning, taking into account the context in which the words are used.' ").

[21] *Random House Webster's College Dictionary* (2d ed), p 430; see also *Kent Co Aeronautics Bd v Dep't of State Police*, 239 Mich App 563, 578; 609 NW2d 593 (2000), aff'd on other grounds sub nom *Byrne v Michigan*, 463 Mich 652; 624 NW2d 906 (2001) ("When a term or phrase is not defined in a statute, courts may consult dictionary definitions to determine the plain and ordinary meaning of a word.").

[22] See, generally, *Stozicki v Allied Paper Co, Inc*, 464 Mich 257, 263; 627 NW2d 293 (2001) ("If the Legislature had meant to make an employer's initial decision to use a particular benefit reduction provision irrevocable, *it could have used language to that effect.*") (emphasis added).

[23] *Random House Webster's College Dictionary* (2d ed), p 154.

[24] See *In re Clark Estate*, 237 Mich App 387, 392; 603 NW2d 290 (1999); see also anno: *Wills: when is will signed at "end" or "foot" as required by statute*, 44 ALR3d 701, § 3.

pose of a signature requirement. A signature is intended to authenticate a will, demonstrating to all who read it that it is the testator's genuine will.[25] By appearing at the end of a will that was not witnessed,[26] a signature may also help clarify two important points. First, the signature can be used to inform anyone reading the will that there are no additional, missing pages, making it clear what the testator's intentions were as a whole.[27] Second, because the Revised Probate Code does not require a holographic will to be written on blank paper, or even paper at all,[28] a signature can create a visual distinction between the material provisions of the will and other text or stray marks that appear in the same space. In some instances, a signature positioned at the end of the text rather than at the end of a page would even

---

[25] See *In re Skoog Estate*, 373 Mich 27, 29-30; 127 NW2d 888 (1964) (whether will was valid depended on whether the testator signed it); *People v Kozyra*, 219 Mich App 422, 425-426; 556 NW2d 512 (1996) (testator would not sign the will offered by the defendant and another person, so they forged his signature to make it appear that the will was valid); see also MCL 700.3(1) (" 'Authenticated' means that the genuineness and validity of the original or a copy of a public or official document, instrument, or record is proved."); *Borchers v Borchers*, 145 Ark 426; 224 SW 729 (1920) (signature prevents fraud).

[26] If there were witnesses to the will, the will would not ordinarily be probated under the holographic will statute and the witnesses could testify with regard to the circumstances surrounding the will. See *In re Skoog Estate, supra* at 29-30.

[27] See, generally, *In re Cooch Estate*, 367 Mich 445, 447; 116 NW2d 740 (1962).

[28] Though they have an apocryphal quality, law school professors who teach in the area of wills, trusts, and estates are quick to come up with examples of unusual wills scrawled in the dust on top of a table by a dying man trapped in a remote mountain cabin, written in the lining of a coat and discovered by a dry cleaner, painted on a mirror in lipstick, or tattooed onto someone's arm. Whether any of these stories are true is not the point. Rather, they are important because they illustrate the many ways in which testators may fulfill the writing requirement reflected in the Revised Probate Code. See *In re Dodson Estate*, 119 Mich App 427, 429; 326 NW2d 532 (1982).

help prevent fraud because it would eliminate blank space in which someone could attempt to add other provisions to the will.

A signature would not play this important role of establishing the true boundaries of a will if it were required, in every instance, to appear at the bottom of whatever served as the paper or writing surface. This is not to say, however, that a signature must appear within so many inches or fractions of an inch of where the testator finished the will. Nor do we suggest that there would be any significant difference between a signature that appeared at the end of the same line as the end of the text or below the end of the text. Further, we do not imply that the spatial relationship between the signature and the date is at all dispositive when determining the validity of a holographic will. Imposing such requirements is unwarranted under the plain language of MCL 700.123 and would only serve to complicate what should be a simple way for individuals to dispose of their property. Rather, giving the word "end" its ordinary meaning, we are confident that the Legislature intended to permit a testator to sign a will in a place following its material provisions, even if the signature does not appear at the bottom of the page on which the will was written and even if other text or markings appear on the same page.

### B. ANALYZING THE WILL

Mr. Bem drafted his will in a somewhat complex manner. Thus, in order to address Rosemarie Bem's contention that the additional material on the second page of that will, especially the devises to Mr. Bem's sisters, affected the legal sufficiency of his signature

under MCL 700.123, we examine the will from beginning to end.

The signature for the August 15 will clearly follows the material provisions written on the first page and the top of the second page. Ignoring the nine lines added to the bottom half of the second page, this signature appears at a place that might naturally be described as the conclusion of the will. That Mr. Bem placed a date under his signature on the page is of no consequence. This is the second place he dated the will and, therefore, it is mere "surplusage."[29] Consequently, this original holographic will satisfied the signature requirement in MCL 700.123.

There is no specific legal term to describe the first line Mr. Bem added to the will following the August 15, 1991, date. Setting aside Rosemarie Bem's contention that the August 15 will is a conditional will and that this sentence refers to the nonoccurrence of the condition precedent that Mr. Bem die during his trip to Kentucky, this first additional sentence merely sets forth a statement of historical fact similar to a diary entry. This reference to the Kentucky trip was not an attempt to republish the August 15 will because it did not reaffirm the substance of the August 15 will at all.[30] Nor does the line constitute a codicil because it makes no attempt to "explain, modify, add to, subtract from, qualify, alter, restrain or revoke provisions in an existing will."[31] The Revised Probate Code does not describe any formalities that apply to this sort of

---

[29] See *In re Fowle's Estate*, 292 Mich 500, 504; 290 NW 883 (1940).

[30] See, generally, *In re Kramer's Estate*, 324 Mich 626, 629; 37 NW2d 564 (1949).

[31] Black's Law Dictionary (6th ed), p 258; see also MCL 700.12(3) (a will "includes [a] codicil and any other testamentary instrument which merely appoints an executor or revokes or revises another will.").

simple statement of fact. Even with Mr. Bem's signature and the handwritten date on the same line as this statement, the statement is nothing more than extra verbiage, clearly outside the realm of testamentary language.[32] Given the legally acceptable placement of the signature following the August 15 will and the absence of a provision in the Revised Probate Code governing this sort of statement, there is no legal basis to conclude that this line affected the legal validity of that original signature in any way.

The second and third lines Mr. Bem added to his will following August 15 appear coupled, indicating that they should be read together. Like the first additional line, these second and third lines do not constitute a codicil because they make no attempt to alter the August 15 will in any way. Rather, again setting aside whether this was a conditional will, the third line makes clear that Mr. Bem intended to republish the will, reaffirming its substance. Though perhaps providing some emotional value to the testator, a valid will need not be republished at all because it is only necessary to give renewed effect to a will that has been revoked.[33] In any event, these second and third lines complied with all the formalities in MCL 700.123: the lines are written in Mr. Bem's handwriting, they are dated, and they are signed at the end. Thus, there is no reason to conclude that this republication statement did anything but continue the effectiveness of the August 15 will.

The fourth and fifth lines added to the second page of the will must be read together because the fifth

---

[32] See, generally, *In re Fowle's Estate, supra.*

[33] See, generally, *In re Blanchard Estate,* 391 Mich 644, 653 (COLEMAN, J.), 663-664 (T.M. KAVANAGH, C.J., dissenting); 218 NW2d 37 (1974).

line is merely a continuation of the sentence started on the fourth line. Together, these fourth and fifth lines constitute a codicil because they alter the way the August 15 will disposes of Mr. Bem's property. For the first time, Mr. Bem's sisters are designated as devisees, each to receive $1,000. In order for this codicil to be effective, Mr. Bem had to execute it in the same manner he executed the will,[34] which he did by drafting the codicil in his own handwriting, dating it,[35] and signing it at the end.

Nevertheless, Rosemarie Bem finds it significant that Mr. Bem inserted an asterisk before his signature and that he had also used an asterisk between "Aug 18, 1991" and his signature on the third line where he wrote that "All Conditions remain the same as written[.]" She contends that the signature and the date at the end of this fifth line were not intended to authenticate the codicil. Rather, Mr. Bem intended his signature to be read solely in relation to the reaffirmation of the August 15 will, leaving the codicil unsigned and undated. In support of this argument, Rosemarie Bem points out that a single asterisk technically "directs the reader to its partner elsewhere on the page for the rest of the information."

We disagree with this argument in a number of respects. While an asterisk may very well serve as an internal cross-reference in a document, there is no indication from Mr. Bem's handwriting that he intended for the star-shaped mark he made next to his signature to be an asterisk or intended for the

---

[34] See *In re Clark Estate, supra* at 391.

[35] Rosemarie Bem does not contend that the codicil is invalid because the October 17 date appears slightly below Mr. Bem's signature; he evidently placed the date there, having run out of room to write in the right margin.

mark to have this technical meaning. To paraphrase *Grace v Thompson*,[36] the will itself is the only grammar book we need to determine Mr. Bem's intent in making this mark. Mr. Bem's handwriting, though mercifully legible, includes numerous irregularities that we take into consideration.[37] He used inconsistent capitalization, underlining, spacing, and margins, mixed script with printing, and inserted punctuation at unusual places, if at all. Mr. Bem dated various portions of the will and other statements on the same paper in no less than four different ways. He also used a plus mark where an ampersand would be appropriate and used an equal sign in the place of dashes and colons. The face of the will makes clear that Mr. Bem did not write in a technical manner, which makes Rosemarie Bem's technical definition of an asterisk inappropriate when determining his intent in making this mark.[38]

Mr. Bem also wrote "all conditions remain the same" three times in the space following the August 15 will. In each instance, he signed and dated the statement on the same line and within a fraction of an inch of where the statement ended. This consistent pattern existing both before and after the codicil suggests that Mr. Bem would have simply stated that "all conditions remain the same" had he meant for those words to appear in the fifth line rather than using the

---

[36] *Grace v Thompson (Continental Trust Co)*, 169 Md 653, 657; 182 A 573 (1936), quoted in *In re McKay Estate*, 357 Mich 447, 451; 98 NW2d 604 (1959).

[37] See *In re McKay Estate, supra* at 451 ("It is easy to observe, as the circuit judge pointed out, that testatrix was poorly schooled in spelling and grammar and had little knowledge of the legal effect of words. To find her intent, we look to the use of words as she employed them in her will.").

[38] See *In re Coe Trusts, supra* at 535.

asterisk to incorporate that statement by reference. In fact, though not using this same language, he expressed his intent for the provisions of the August 15 will to remain unaltered except for these three additional devises by writing "Extra" at the beginning of the fourth line. Therefore, there was no reason why this asterisk necessarily referred to the third line, having already expressed the same sentiment.

Further, at the top of the second page of the will, within the August 15 will, Mr. Bem made what appears to be another star. This star, though slightly larger than the asterisk on the fifth line, immediately preceded Mr. Bem's direction that his personal representative sell his car and home, making the proceeds part of the estate. Rosemarie Bem has not explained why, if we were to give the mark on the fifth line the technical meaning of an asterisk, it would not refer to this earlier disposition of property.

If we were to infer that the asterisk incorporated something by reference, it is more likely that Mr. Bem meant for the will to be read as if he inserted the third line into the fifth line, as if to say:

> Extra = Three Sisters = Bernice Burchart + Rose Brent + Genevieve Drew shall receive the sum of 1000 $^{00}$ each. All conditions remain the same as written. J R Bem

In the end analysis, however, we can give no definitive meaning to what may have been a mark solely intended to draw attention to Mr. Bem's signature, a mark meant to insert the date below his signature into the proper place on the fifth line, or a mark that was merely a doodle. We cannot agree with Rosemarie Bem that Mr. Bem used an asterisk to alert a reader to his intention not to sign the codicil at the end, where he had plainly signed, but, effectively, to

move his signature to another line. Contrary to Rosemarie Bem's argument, it is unnecessary for us to remand this case to the probate court so that it can make findings of fact concerning this mark. The probate court can have no better insight into the meaning of this mark because it will simply examine the same document we have before us.[39] Having conformed with the formalities required of this codicil, the August 15 will as amended by the codicil[40] is valid at this point in the analysis, despite this superfluous mark.

The sixth additional line combines elements of the first and third additional lines. The sixth line reports as a matter of fact that Mr. Bem had completed his trip to New York "OK" and that he continued the conditions of the will. He ended the line with the date and his signature. As we noted in the analysis of the first line, the first part of this provision required no formalities. Again, without yet deciding whether this was a conditional will, we conclude that Mr. Bem had no need to republish the August 15 will as amended, but he did so with the required formalities. Thus, the sixth line does not affect our working conclusion that the August 15 will as amended is valid.

The seventh line is essentially the same as the third and fourth lines. In this line, Mr. Bem anticipates his upcoming trip to Hawaii and states that all the other terms of the will are to stay the same, following the statement with his initials and the date. As with the

---

[39] See *In re Stuart's Estate*, 274 Mich 282, 284; 264 NW 372 (1936) ("Construction of the will must be had from its four corners . . . .").

[40] Had Mr. Bem failed to comply with all the formalities necessary to make this codicil effective, the likely consequence would have been to disregard the codicil, leaving the August 15 will still valid. See *Loomis v Laramie*, 286 Mich 707, 712-713; 282 NW 876 (1938).

third and fourth lines, we conclude that this line has no effect on the validity of the August 15 will as amended by the codicil.

Rosemarie Bem contends that MCL 700.123 requires a testator to date a will with the day, month, and year the testator signed the will, noting that the eighth and ninth lines each lack this sort of date. Yet, she provides no authority from Michigan, much less authority construing the holographic will statute, to support this proposition. She also points out that the ninth line lacks Mr. Bem's signature. Critically, however, neither the eighth nor the ninth line referred to the will or a testamentary disposition in any way whatsoever. Again, these lines are solely extraneous statements that do not require any formalities, whether dates or signatures.

In summary, the two pieces of paper submitted to the probate court as Mr. Bem's will include five testamentary writings: (1) the August 15 will, (2) the August 18 republication, (3) the October 17 codicil, which became part of the will, (4) the November 14 republication, and (5) the December 4 republication. Each of these writings is easily and separately identifiable. The other marks and writing on the second piece of paper, including the asterisks, neither contradict nor confuse the plain nature of Mr. Bem's five efforts, consolidated on these two sheets of paper, to dispose of his property following his death. Because Mr. Bem followed all the necessary testamentary formalities when disposing of his property, even in the unnecessary republications, we conclude that this will as amended by the codicil was properly admitted to probate.

### V. CONDITIONAL WILL

#### A. CONTINGENT LANGUAGE

Rosemarie Bem also argues that Mr. Bem's entire will was conditional and that the condition precedent, his death on one of the enumerated trips, did not occur. Thus, she claims, he died intestate.

The Revised Probate Code does not define a conditional will. Nor does it indicate what language a testator must use to make a will or a provision in it conditional. Case law reveals that, consistent with the policy of allowing individuals to dispose of their property after death to the extent allowed by law,[41] a testator may impose a condition precedent in a will.[42] A condition precedent is "one which must happen or be performed before the estate to which it is annexed can vest or be enlarged."[43] Stated another way, a condition precedent is the contingency described in the will that must occur for the specific devise subject to the condition to vest.[44] "A vested property interest is one that is capable of becoming possessory immediately upon the expiration of the preceding estate."[45] In the context of a will, a person has a vested, not a contingent or conditional, interest if the testator's death is the only contingency that must occur before the

---

[41] See *In re Coe Trusts, supra* at 533-534.

[42] See, generally, *In re Erickson Estate*, 346 Mich 432, 436; 78 NW2d 256 (1956) (The testator "had a right to attach to a gift in his will any lawful terms or conditions he saw fit.").

[43] See Black's Law Dictionary (6th ed), p 293.

[44] See *In re Kurtz Estate*, 113 Mich App 769, 774; 318 NW2d 590 (1982) ("The contingency is the death of Helen Utley without issue. Once that event occurred, the legacies would take effect. If the contingency had never occurred, the estates would never vest."); see also *Markham v Hufford*, 123 Mich 505, 509-510; 82 NW 222 (1900).

[45] *Hubscher & Son, Inc v Storey*, 228 Mich App 478, 483; 578 NW2d 701 (1998).

interested person is entitled to receive the devise at issue.[46]

Though the law unambiguously favors interests in estates that vest immediately rather than after a contingency occurs,[47] a testator's intent as expressed in the plain language of the will is key to determining whether his will or any portion of it is subject to a condition precedent.[48] The few Michigan cases dealing with conditional wills or devises illustrate that, though there is no magic formula for creating a conditional will or a conditional devise within a will, a testator must use clear and unambiguous language to create the condition.

For instance, in *In re Bair Estate*,[49] the testator and testatrix executed a joint and mutual will. The will provided it was "solely for the purpose of providing for the disposition of our property in the event that" both were "killed in the same accident" or one died in an accident and the surviving spouse was "in such condition, either mentally or physically that he or she is unable to make a disposition of his or her property."[50] This Court concluded that the conditional language in the will was unambiguous and that, because the husband died before the wife and the wife was not physically or mentally disabled, the wife had died

---

[46] See, generally, *In re Shumway's Estate*, 194 Mich 245, 254; 160 NW 595 (1916). But see *In re Finlay Estate*, 430 Mich 590, 600-601; 424 NW2d 272 (1988) (a testator may always change a will during his lifetime).

[47] See *In re Jamieson Estate*, 374 Mich 231, 237; 132 NW2d 1 (1965); *In re Hurd's Estate*, 303 Mich 504, 510; 6 NW2d 758 (1942).

[48] See, generally, *In re Kurtz Estate, supra* (focusing throughout on testator's intent in determining whether a condition precedent existed in the different will provisions).

[49] *In re Bair Estate*, 128 Mich App 713, 714; 341 NW2d 188 (1983).

[50] *Id.*

intestate because neither of the specified conditions had occurred before her death.[51]

Similarly, in *Dusbiber v Melville*,[52] the Michigan Supreme Court concluded that the testator created a condition precedent when his will provided "in the case that" a specific circumstance occurred and required the estate's executor to verify that the circumstance had occurred. Though the testatrix in *In re Kurtz Estate*,[53] did not require her personal representative to verify that a condition precedent occurred, this Court nevertheless determined that the wording in the will that "[i]n the event my said daughter, Helen K. Utley predecease me, or in the event that she shall after my decease, die leaving no such issue her surviving" created a condition precedent to fulfilling the residuary clause.

However, when presented with ambiguous language, Michigan courts rely on the rule of will construction that favors adopting "any reasonable construction of a will" in order to avoid intestacy if possible[54] and tend to conclude that a will does not include a condition precedent. The Michigan Supreme Court reached just this conclusion in *Scott v Roethlisberger*.[55] At issue in *Scott* was a provision in the testator's will that stated, "At the death of my said wife, Rachael Stafford, should she survive me, I give, devise and bequeath all that then remains of my said estate, after paying the expense of last illness and funeral as above stated, to my five children . . . ."[56]

[51] *Id.* at 717.

[52] *Dusbiber v Melville*, 178 Mich 601, 602-603; 146 NW 208 (1914).

[53] *In re Kurtz Estate, supra* at 772-773.

[54] See *In re Bruin Estate*, 370 Mich 34, 45; 120 NW2d 752 (1963).

[55] *Scott v Roethlisberger*, 178 Mich 581; 146 NW 307 (1914).

[56] *Id.* at 582.

The will then proceeded to devise to each of the children portions of the estate in different proportions, granting two of the children life estates in the property distributed to them.[57] The children who received only life estates, but who would have taken assets from the estate in fee simple had their father died intestate, challenged the will, contending that the devise was conditional.[58] They claimed that the condition precedent was that Rachael Stafford had to survive the testator, but the condition never occurred because she died before the testator.[59] The Court observed the testator's careful attempt to provide for his children but treat them differently, commenting that allowing the children to inherit under the laws of intestacy would defeat this obvious intent.[60] More importantly, however, the Court could not find any language in the will that specifically made the will conditional.[61]

### B. ANALYZING THE WILL REDUX

Though Mr. Bem referred to five separate trips on the two pages of paper that include his will, the reference that most resembles a condition precedent appears in the very first sentence of the August 15 will. There, Mr. Bem wrote, "Being of good health and right mind I write this just in case something should happen to me on the projected trip to Louisville, Kentucky . . . ." Critically, the phrase "just in case something should happen . . . on the trip to Louisville" ref-

---

[57] *Id.*

[58] *Id.* at 583.

[59] *Id.*

[60] *Id.* at 583-584.

[61] See *id.* at 584-585.

ers solely to Mr. Bem's decision to "write" the will.
Neither this sentence nor any other part of the text
mentions a relationship between carrying out the dis-
positive provisions of the will and this trip. Accord-
ingly, a reasonable interpretation of this language is
that Mr. Bem decided to draft a will because he
thought there was a possibility that he might die dur-
ing the trip, not because he wanted the will to be
valid only if he died on the trip. Stated differently, the
journey was simply the motivation for Mr. Bem to
draft the will.[62] That Mr. Bem concluded the August
15 will by stating that he had "many more requests
but for now this is all I desire to have done" also
demonstrates that he anticipated this would continue
to be his will in the future, subject to any valid
codicils.

The references to the other trips provide even less
credible evidence of Mr. Bem's intent to make his will
conditional. The first additional line following the
August 15 will simply states that he returned from
Kentucky without incident. The language Mr. Bem
used in this line is not conditional in any sense.

The second additional line refers to his trip to New
York, yet it does not say that the will is to be effective
only if Mr. Bem died during the trip. In fact, this line
does not make any connection between Mr. Bem's
trip and his will. Only the third additional line, which
indicates, "All Conditions remain the same as writ-
ten," refers to the will at all. If, as Rosemarie Bem
contends, the introductory sentence in the August 15

---

[62] This motivation to write a will in anticipation of a journey was, by no
means, unique to Mr. Bem. See *In re Cosgrove* Estate, 290 Mich 258, 261;
287 NW 456 (1939); *In re Lacroix's Estate*, 265 Mich 59, 65; 251 NW 319
(1933); anno: *Determination whether a will is absolute or conditional*, 1
ALR3d 1048, §§ 2-4.

will is a condition precedent that did not occur, it is reasonable to construe Mr. Bem's reference to "conditions" to mean only that the dispositive portions of the August 15 will remained effective because the alleged condition that Mr. Bem die on a trip is inseparable from his reference to the specific trip to Kentucky. Thus, it would make no sense, if this were a conditional will, for the whole introductory sentence to remain effective after Mr. Bem successfully completed his journey to and from Kentucky. Further, Mr. Bem added this "conditions remain the same" language shortly after he *returned* from the trip to Kentucky, a full two months before the planned trip to New York. That he drafted this supposed renewal of the condition precedent so early suggests that he intended the will to be effective at times other than during the trip.

Interestingly, Mr. Bem added the codicil at the fourth and fifth additional lines two days before he anticipated leaving for the trip to New York he mentioned in the second additional line. This codicil is unquestionably absolute, making a straightforward devise to Mr. Bem's sisters. It contradicts any inference that, by adding each of these lines anticipating a trip, Mr. Bem intended his will to be conditional.

The sixth line strikes us as substantially similar to the reference to the trip to New York in the first additional line. The sixth line does not include any conditional language, but merely reports that Mr. Bem returned from New York.

The last three additional lines on the second page of the will are quite remarkable. Mr. Bem started each line with the word "To" and the name of a place. We gather that he intended to go to each of these places. However, these lines stand in stark contrast to the

well-written and complete sentences he used in his August 15 will. Other than the reminder that "All Conditions Remain the Same" at the end of the seventh line, these lines fail to express Mr. Bem's intent to condition the will on the occurrence of any event. This falls far short of the clear language necessary to create a condition precedent.

Overall, nothing on either of the two pages suggests that Mr. Bem intended to say that *if* he died on any of the enumerated trips, *then and only then* did he want his estate distributed according to the will. Moreover, unlike the situation in *In re Bair Estate, supra,* in which the condition precedent could be explained as allowing the surviving spouse to draft his or her own will, we have no plausible explanation for why Mr. Bem would choose to die intestate if he did not die on one of the trips.[63]

Affirmed.

---

[63] See *In re Bair Estate, supra* at 717.

## APPENDIX

dated Aug. 15, 1991  5872-2146

Being of good health and right mind I write this just in case something should happen to me on the projected trip to Louisville, Kentucky for the Amvets National Convention (5:45 AM Aug. 16 to 10:PM Aug. 17, 1991)

My request is; that, if I am incapacitated in any way or God willing, my death, then all my personal, financial and spiritual arrangements should be in charge of my son John A. Bem but failing him then My Daughter Marylou Ziarko.

All necessary information and securities will be found in the Condo. All personal items should be divided as fair as possible between Son and Daughter.

First request is that John A Bem Receives the sum of $20,000 before any other business is begun as to the Estate. Second, the Loan to Marylou Ziarko in the amount of $20,000 shall be considered paid in full.

Third The Poker table is a John A Bem request and it is his.

Fourth The Banquet Pattern" Dining set of dishes are for Marylou Ziarko

Fifth The Amvets Post 45 are to receive $500.00 for the Honor Guard

Sixth All Grandchildren will receive $9000.00 each (less any Loans owed)

Seventh all Great Grandchildren will receive $4500.00 each.

next page

*Eighth* = The Auto and the Condo to be sold and added to the Estate.

*Ninth* = Coins, Stamps, medals and all collectibles should also be sold at the best price and added to the Estate.

*Tenth* - Patricia Bem will receive the sum of $9995.00

*Eleventh* = Keith Vander Maas will receive the sum of $1000.00

*Twelfth* - Rosemarie L. Bem to receive the sum of $1000.00

*Thirteenth* = All remaining assets and items shall be divided (John C. Bem, Vic Leo Zinke)

*Fourteenth* = There are many more requests but for now this is all I desire to have done.

Joseph K. Bem
August 15, 1991

The trip to Louisville, KY was OK. (JKBem.) aug. 17, 1991 – 16 30 PM

Next trip is to Post 45 Buffalo N.Y. Oct. 19, 1991
All Conditions remain the same as written aug 18, 1991 * JKBem.

Extra = Three Sisters = Bernice Burchart + Rose Brent + Genevieve Drew shall receive the sum of 1000.00 each. * JKBem 10-17-91

Buffalo Trip Completed OK. All Conditions Remain the Same Nov. 14, 1991

To Hawaii Dec 5, 1991 All conditions Remain the Same JKBem Dec 4 1991

To Las Vegas OK JKBem

To Tennessee Oct 23-4-5-6 – 1992